14 F.3d 600
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Nancye CALLAHAN, Plaintiff-Appellee, Cross-Appellant,
v.
HUTSELL, CALLAHAN & BUCHINO P.S.C. REVISED PROFIT SHARING
PLAN, et al., Defendants,
Courtney CALLAHAN, et al., Defendants-Appellants, Cross-Appellees.
 Nos. 92-5796, 92-5797 and 92-5862.
 United States Court of Appeals, Sixth Circuit.
 Dec. 20, 1993.
 
 Before: MILBURN and NELSON, Circuit Judges, and GILMORE, Senior District Judge.[1]
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 This is a declaratory judgment action in which Nancye Oehrle Harcourt Callahan ("Nancye"), the widow of Edward L. Callahan, M.D. ("Ed"), sought a determination that she was entitled to death benefits due under pension and profit-sharing plans maintained by her late husband's professional service corporation. Among the parties named as defendants was First Kentucky Trust Company, which served both as executor of Ed's estate and as trustee of a revocable trust that Ed had designated as the beneficiary under his company's plans in notices filed with the plan administrator prior to his marriage to Nancye. The beneficiaries of the trust included Ed's mother and his children by an earlier marriage.
 
 
 2
 Nancye and Ed entered into an antenuptial agreement shortly before their wedding. The agreement made reference to a certain designation form that Ed presumably intended to give to the plan administrator, following the marriage, in order to renew his designation of the trust as beneficiary under the plans. The form contained a "spouse consent" section designed to be executed by Nancye as Ed's wife, and the antenuptial agreement contained a provision in which Nancye agreed that Ed might designate any beneficiary he desired. The agreement further provided that Nancye would execute the form "as soon as possible" after marrying Ed.
 
 
 3
 Nancye says she never signed a new beneficiary designation form. It is unclear, at this point, whether Ed did. In any event, Ed died two months after his marriage to Nancye without having delivered a new designation form to the plan administrator.
 
 
 4
 Absent receipt by the plan administrator of a designation naming a non-spouse beneficiary and reflecting spousal consent, the pertinent provisions of the plans say that the widow of a participant is the beneficiary. These provisions were adopted in response to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Retirement Equity Act of 1984 ("REA"). See 29 U.S.C. Sec. 1055.
 
 
 5
 The defendant trust company filed a counterclaim seeking, among other things, "a judgment that Nancye has waived all rights to Ed's death benefits under the Plans under the terms of the Plans and under ERISA as amended by REA." The district court held, on cross-motions for summary judgment, that the trust company was not entitled to such a judgment.
 
 
 6
 We agree that Nancye was the beneficiary under the terms of the plans. On the record before us, however, it is difficult to tell whether there is any merit to an alternative claim advanced by the trust company; namely, that even if Nancye was the lawful beneficiary under the terms of the plans, she should be required to relinquish her benefits to the trust company in its capacity as executor of Ed's estate for the reason that Nancye's failure to execute the beneficiary designation form constituted a breach of her obligations under the antenuptial agreement.
 
 
 7
 In an opinion explaining its denial of a motion to alter or amend the judgment, the district court stated that "[t]he result reeks with inequity." The court nonetheless denied an implied request by the trust company for an opportunity to conduct discovery on the breach of contract claim. Given the highly unusual circumstances of this case, we think that the trust company's request ought to have been granted. We shall therefore vacate the judgment and remand the case for further proceedings.
 
 
 8
 * Ed Callahan was a pathologist employed by Hutsell, Callahan & Buchino, P.S.C., a professional service corporation organized under Chapter 274 of the Kentucky Revised Statutes. As a corporate employee, Ed was a participant in both a money purchase pension plan and a profit sharing plan established by the corporation in 1974. Each of these plans came within ERISA's definition of an "employee pension benefit plan," see 29 U.S.C. Sec. 1002(2)(A), and it will be convenient for us to refer to both as "pension" plans.
 
 
 9
 In 1977 Ed entered into a revocable inter vivos trust agreement with defendant First Kentucky Trust Company. Effective with amendments made in October of 1988, the beneficiaries of the trust were Mary C. Callahan (Ed's mother), Ed's children, and the Louisville Orchestra.[2]
 
 
 10
 Under date of November 11, 1988, Ed signed "designation of beneficiary" forms naming the trustee as the beneficiary of all post-death benefits under his pension plans. The parties agree that these 1988 designation forms were "on file"--with the plan administrator, presumably--at the time of Ed's death.[3]
 
 
 11
 In August of 1980 Ed asked his lawyer to draft an antenuptial agreement for him and Nancye, his then-prospective spouse. The lawyer, Joseph C. Oldham, did so.
 
 
 12
 Early in 1991 Ed directed attorney Oldham to make some changes in the draft agreement. The changes included provisions under which, following Ed's death, Nancye would receive $100,000, plus medical insurance coverage, payment of a portion of her son's educational expenses, and certain rights in Ed's residence. Further changes were made in the draft as negotiations between Ed and Nancye progressed.
 
 
 13
 On March 6, 1991, Ed and Nancye and their respective counsel met to finalize the antenuptial agreement. Some additional negotiations took place at the meeting. In the course of the discussions, according to an affidavit subsequently executed by Mr. Oldham, Ed indicated that he was not going to make any more benefits available to Nancye.
 
 
 14
 In the final version of the antenuptial agreement, as signed and notarized by Ed and Nancye on March 6, 1991, each party waived all claims to the separate property of the other, acknowledging that such property (which was listed in exhibits to the agreement) would always remain separate. The list of Ed's separate property included retirement plan assets valued at more than $1 million.
 
 
 15
 Paragraph 15 of the antenuptial agreement said that Nancye consented, effective upon marriage, to Ed's election to waive a qualified joint and survivor annuity form of benefit in his ERISA plans. Nancye agreed, in this paragraph, that Ed might designate any beneficiary he desired; acknowledged that she would not be entitled to a death benefit under the plans; agreed to execute all further documents requested by Ed to evidence the consents and waivers contained in the agreement; and "specifically agree[d] to execute the attached forms as to ED's interest in the Hutsell, Callahan & Buchino, P.S.C. plan and ED's Individual Retirement Account as soon as possible after marrying ED."
 
 
 16
 Attorney Oldham's affidavit says that "beneficiary designations for the P.S.C. Money Purchase and Profit Sharing Plans were given to Dr. Callahan in the presence of Ms. Harcourt [Nancye] and they were advised that the designations needed to be signed by Ms. Harcourt after the marriage which was set for the following Friday, March 8, 1991." Turney P. Berry, an associate of Mr. Oldham, was also at the meeting. He supplemented Oldham's statement with an affidavit reading in part as follows:
 
 
 17
 "At the time the Antenuptial Agreement was signed, the designation of beneficiary forms for Dr. Callahan's Money Purchase Pension Plan and Profit Sharing Plan of Hutsell, Callahan & Buchino, P.S.C., were presented to Dr. Callahan and Ms. Harcourt and were given to Dr. Callahan. Ms. Harcourt also signed a new Will at that meeting.[4] Ms. Harcourt and Dr. Callahan left the meeting at the same time, each with a copy of the Antenuptial Agreement and his or her respective testamentary documents."
 
 
 18
 A motion for partial summary judgment filed by the defendant trust company shortly after the commencement of this litigation was accompanied by a copy of the antenuptial agreement with an unsigned "beneficiary designation form" attached. It seems fair to infer that this designation form, the caption of which identified both pension plans, is what Messrs. Oldham and Berry were referring to in their affidavits.[5] The pension plan beneficiary designation form named Ed's trust as the recipient of his death benefits. The form had a signature line for Ed opposite an incomplete date:
 
 
 19
 "March __, 1991."
 
 
 20
 The second page of the form, captioned "SPOUSE CONSENT," contained the following text:
 
 
 21
 "I am the spouse of Edward L. Callahan. I have read this Beneficiary Designation Form as completed and signed by my spouse, and I consent to the beneficiary designation made above. I understand that the designation of a Primary Beneficiary other than me means that payment of death benefits from the Plan will not be made to me. If my spouse has checked the 30 day survivor requirement, I understand that benefits will be paid to me only if I survive my spouse by at least 30 days."
 
 
 22
 This was followed by a blank signature line over the words
 
 
 23
 "Spouse of participant
 
 
 24
 /s/ NANCYE OEHRLE CALLAHAN."
 
 
 25
 Below the signature line was a form of notarization, also
 
 
 26
 unexecuted, designed to permit a notary public to
 
 
 27
 attest that Nancye subscribed and swore
 
 
 28
 to the instrument "This __ day
 
 
 29
 of March, 1991."
 
 
 30
 On March 8, 1991, two days after the meeting with the lawyers, Ed and Nancye were married. On March 29, 1991, Mr. Oldham sent Ed a statement for legal services. The transmittal letter noted that "[w]e have not received back from you the Designation of Beneficiary on your Hutsell, Callahan & Buchino, P.S.C. Retirement Plan." On April 18, 1991, Mr. Oldham sent Ed a letter responding to an inquiry on how to forgive a promissory note for $19,689.34 that Nancye had signed in connection with her purchase of a half interest in Ed's residence. The letter again reminded Ed to send the retirement plan beneficiary designations signed by Nancye. For reasons as to which we can only speculate, given the current state of the record, Ed never did so.
 
 
 31
 On May 10, 1991, Ed died. Nancye thereafter demanded that the plan administrator pay her the death benefits due under Ed's pension plans. The plan administrator refused, contending that Nancye had waived her rights to such benefits by signing the antenuptial agreement. The trust company paid Nancye $5,000 of the $100,000 called for by the March 6 amendment of the trust agreement, but declined to pay the balance.
 
 II
 
 32
 Nancye commenced the present declaratory judgment action by filing a verified complaint in the United States District Court for the Western District of Kentucky on September 17, 1991. Defendant First Kentucky Trust Company filed its motion for partial summary judgment three weeks later. The trust company filed an answer and counterclaim at the same time. The counterclaim asserted a claim for specific performance of the antenuptial agreement, including a claim for relinquishment of Ed's death benefits should Nancye be held to be the beneficiary under the pension plans; a claim that the agreement itself constituted a complete waiver of any death benefits under the plans; and a claim that Nancye should take nothing under the trust agreement if she received and kept the death benefits payable under the pension plans.
 
 
 33
 Relying on her verified complaint and an affidavit executed by her lawyer, F. Gerald Greenwell, Nancye moved for summary judgment on November 12, 1991. Mr. Greenwell's affidavit stated that he had represented Nancye in connection with the execution of the antenuptial agreement on March 6, 1991; that he was present when the agreement was signed; that no beneficiary designation forms were attached to the agreement; and that he never saw any signed designation forms.
 
 
 34
 There is no indication that any depositions have ever been taken in this case. Nancye's summary judgment motion was granted in part on February 24, 1992, and the opinion accompanying the court's order makes no reference to deposition testimony.
 
 
 35
 On March 5, 1992, several of the parties, including both Nancye and the defendant trust company, filed motions under Rule 59(e), Fed.R.Civ.P., asking the district court to vacate, alter or amend its decision. Nancye's motion sought reconsideration of the court's denial of an attorney fee request. The trust company's filing, which included the Oldham and Berry affidavits, argued that not until "after adequate time for discovery" should summary judgment have been entered against it on the basis of Ed's not having presented beneficiary designation forms to Nancye for signature. (A supposed failure to present the designation form to Nancye for signature was one of the grounds of the court's decision.)
 
 
 36
 On March 6, 1992, the trust company supplemented its filing with an affidavit in which Ed's long-time stockbroker, Thomas J. Karem, swore that he had met with Ed several days before his death. At that time, according to Mr. Karem's affidavit, Ed stated "that it was still his intention that the assets of his pension fund go to the trust to be administered by First Kentucky Trust Company and that he believed that all documents necessary to ensure that result had now been signed."
 
 
 37
 The district court entered an order on May 22, 1992, denying the motions to alter or amend. The trust company and the trust beneficiaries have appealed, and Nancye has cross-appealed.
 
 III
 
 38
 Under amendments to ERISA enacted in the Retirement Equity Act of 1984, Pub.L. No. 98-397, 98 Stat. 1429, many pension plans of the type at issue here were required to provide for a "qualified preretirement survivor annuity," 29 U.S.C. Sec. 1055(a)(2), that would automatically go to a participant's surviving spouse unless waived in favor of another beneficiary (or another form of benefit) with the written consent of the spouse. 29 U.S.C. Sec. 1055(c)(1)(A).[6] The legislation set forth detailed requirements for a participant's election to waive: each plan, the law said, had to provide that such an election should not take effect unless
 
 
 39
 "(i) the spouse of the participant consents in writing to such election, (ii) such election designates a beneficiary (or a form of benefits) which may not be changed without spousal consent (or the consent of the spouse expressly permits designation by the participant without any requirement of further consent by the spouse), and (iii) the spouse's consent acknowledges the effect of such election and is witnessed by a plan representative or a notary public...." 29 U.S.C. Sec. 1055(c)(2)(A).
 
 
 40
 In response to the 1984 legislation, Section 1.03 of Article I of each of Ed's plans was amended to define a "Beneficiary" as the last person or entity "designated by the Participant in a written notice to the Plan Administrator; provided, however, that ... if the person or entity so designated is not the spouse and such designation does not conform to the spousal consent requirements of Section 4.06 of Article IV, [the beneficiary shall be the participant's] ... widow or widower...."
 
 
 41
 Section 4.06 of the amended version of each of the plans, captioned "Spousal Consent," reads as follows:
 
 
 42
 "In Plan Years beginning after December 31, 1984, the election by a Participant of a designated beneficiary other than his spouse ... is effective only if the Participant's spouse consents to the election in writing, it is witnessed by a plan representative or a notary public, and the spouse's consent acknowledges the effect of the election."
 
 
 43
 The final sentence in Section 1.03 of each of the plans reads as follows: "No notice given under this Section shall be effective unless and until the Plan Administrator actually receives the same."
 
 IV
 
 44
 Although Nancye had not yet become Ed's spouse at the time she executed the antenuptial agreement, the defendant trust company argues that the consent given by Nancye in paragraph 15 of the antenuptial agreement satisfied all the consent requirements of the Retirement Equity Act. The trust company notes that Nancye's consent was in writing, that it expressly permitted Ed to designate any beneficiary he desired, that it acknowledged the effect of the election, and that it was witnessed by a notary public.
 
 
 45
 The district court rejected the trust company's argument. The court held in effect that one who has not yet become the "spouse" of a plan participant lacks capacity to consent under 29 U.S.C. Sec. 1055.
 
 
 46
 The district court's conclusion that an antenuptial agreement can never supply spousal consent finds support--at least insofar as the plan-qualification requirements of the Internal Revenue Code are concerned--in Question and Answer 28 of Treas.Reg. 1.401(a)-20:
 
 
 47
 "Q-28: Does consent contained in an antenuptial agreement or similar contract entered into prior to marriage satisfy the consent requirements of [26 U.S.C.] sections 401(a)(11) and 417?
 
 
 48
 A-28: No. An agreement entered into prior to marriage does not satisfy applicable consent requirements, even if the agreement is executed within the applicable election period."
 
 
 49
 This pronouncement may be based on the idea that the statutes require consent by "the spouse," and a spouse-to-be is not a spouse. Such reasoning would appear difficult to reconcile with the logic employed by this court, in a very different context, in United States v. Honaker, 5 F.3d 160 (6th Cir.1993). It is not readily apparent to us why a spouse-to-be could not give consent, as Nancye purported to do here, effective upon her becoming an actual spouse. At least one court, explicitly rejecting the interpretative rule contained in Question and Answer 28, has held that a consent contained in an antenuptial agreement may satisfy the statutory requirements. In re Estate of Hopkins, 214 Ill.App.3d 427, 574 N.E.2d 230 (1991).
 
 
 50
 The district court disagreed with Hopkins, and there is no need for us to resolve that conflict here. Whether or not the consent given by Nancye in the antenuptial agreement satisfied the post-1984 requirements of ERISA, it is clear to us--as it was to the district court--that the consent did not satisfy the requirements of the pension plans themselves.
 
 
 51
 The plan documents, it will be recalled, provided that a participant's designation as beneficiary of someone other than his spouse had to conform to the spousal consent requirements of Section 4.06 of the plans. While any beneficiary designation could be changed, moreover, the plans provided that no notice given under the "Beneficiary" section should be effective prior to receipt by the plan administrator.
 
 
 52
 The 1988 designations naming the trust as beneficiary were on file with the plan administrator, but they did not comply with the spousal consent requirements of Section 4.06. The antenuptial agreement signed by Ed and Nancye two days before their marriage may or may not have complied with the spousal consent requirements, but we have no reason to believe that it was ever received by the plan administrator.
 
 
 53
 The trust company suggests that Ed himself was the plan administrator, but the summary plan description identifies the administrator as the corporation--and there has been no showing that Ed purported to receive the antenuptial agreement on behalf of the corporation. It would make no difference if he had done so, moreover, because the antenuptial agreement did not designate the trust as Ed's beneficiary. The designation was to be accomplished through the designation form prepared for execution by Ed and Nancye after their marriage--and no one contends that such a form, signed by Ed and Nancye and acknowledged by Nancye before a notary, was ever received by the corporation.
 
 
 54
 As far as the plan administrator is concerned, then, there can be no question as to who is entitled to receipt of the death benefits. The plan documents make Nancye the beneficiary, absent receipt by the plan administrator of an effective designation of someone else, and because no such designation was received, the administrator is obligated to pay the benefits to Nancye.
 
 
 55
 Under 29 U.S.C. Sec. 1104(a)(1)(D), the administrator has a duty to act "in accordance with the documents and instruments governing the plan...." This statutory language means exactly what it says; the plan documents control. See McMillan v. Parrott, 913 F.2d 310, 311-12 (6th Cir.1990). Cf. Howard v. Branham & Baker Coal Co., (unpublished) No. 91-5913 (6th Cir., July 6, 1992) (lawful provisions of plan documents must be followed even if the result seems inequitable).
 
 
 56
 If ERISA plans were not to be administered according to their controlling documents, the lives of plan administrators would, to say the least, tend to become unduly complicated. "Rules requiring payment to the named beneficiary yield simple administration, avoid double liability, and ensure that beneficiaries get what's coming to them without the folderol essential under less-certain rules." McMillan, 913 F.2d at 312, quoting Fox Valley & Vicinity Constructions Workers Pension Fund v. Brown, 897 F.2d 275, 283 (7th Cir.) (en banc) (Easterbrook, J., dissenting), cert. denied, 498 U.S. 820 (1990). In 29 U.S.C. Sec. 1104(a)(1)(D), Congress flatly rejected "less-certain rules." Under ERISA, therefore, the plan administrator must follow the plan documents as written.
 
 V
 
 57
 The fact that the plan administrator must act in accordance with the plan documents, however, could not relieve Nancye of her obligation to act in accordance with her contractual undertakings. "Paragraph 15 of the Antenuptial Agreement," as the district court correctly stated, "contemplates that Nancye would execute consents and waivers if such documents were provided to her." Nancye's contractual commitment to sign the "spouse consent" portion of the beneficiary designation form was supported by good and sufficient consideration, it was memorialized in a writing signed by her in the presence of a notary public, and it was unquestionably enforceable under Kentucky law. If Ed was prevented from filing a fully executed designation form with the plan administrator because of a breach by Nancye of her solemn undertaking to sign the form, we see no reason at all why Ed's executor may not hold her to her bargain and require her to disgorge whatever benefits she receives as a result of the breach.
 
 
 58
 It is true that the provisions of ERISA supersede state laws relating to employee benefit plans, see 29 U.S.C. Sec. 1144(a), and Kentucky's law of contracts cannot be invoked to rewrite the federal statute. But neither the letter of the statute nor the policies it embodies will be compromised, in our view, if the courts decline to let Nancye keep benefits she would never have received but for a breach of her contract with Ed. The participant in the plans was Ed, after all, and it was he whom Congress intended should be "master of his own ERISA plan." McMillan, 913 F.2d at 312.
 
 
 59
 Whether Nancye did violate her contract is a question that cannot be answered on the basis of the record as it now stands. The district court was initially under the impression that "Ed [n]ever presented any waiver or consent form to Nancye...." Slip Op. of Feb. 24, 1992, at 9. If Ed never gave her the form to sign, Nancye can hardly be faulted for not signing it. But with the filing of the motion to alter or amend, as the court observed in denying the motion, the trust company "attempt[ed] to offer evidence that Nancye had been requested to sign additional documents...." Slip Op. of May 22, 1992, at 1. Even if this evidence was not sufficient to show the existence of a genuine issue as to whether Ed gave Nancye the designation form to sign, it seems clear to us that the defendants should have been given a limited period of time within which to take Nancye's deposition and conduct such other discovery as might be appropriate under Rule 56(f), Fed.R.Civ.P.
 
 
 60
 It may turn out that the district court's initial impression was correct--that Ed unquestionably failed to present the designation form to Nancye for signature. If so, the result previously announced by the court was probably correct across the board.[7] It may turn out, on the other hand, that Ed unquestionably did present the designation form to Nancye for signature and that she wrongfully failed to sign it. Or it may turn out that a trial will have to be conducted before it can be determined what actually happened. In any event, we need to know more than we know now before we can be confident that there has been a proper disposition of this case.
 
 
 61
 The judgment of the district court is VACATED, and the case is REMANDED for further proceedings not inconsistent with this opinion.
 
 
 62
 GILMORE, Senior District Judge, dissenting.
 
 
 63
 I respectfully dissent from the opinion of the majority. I think there is a clear basis to reverse the district court and grant summary judgment for Defendants, rather than to remand the case to the district court for additional discovery.
 
 
 64
 Section V of the majority opinion begins with the following sentence: "The fact that the plan administrator must act in accordance with the plan documents, however, could not relieve Nancye of her obligation to act in accordance with her contractual undertakings." I wholeheartedly agree with this statement. Nancye's contractual promises were supported by good and sufficient consideration, were memorialized in a writing signed by her in the presence of a notary republic, and were unquestionalby enforceable under Kentucky law.
 
 
 65
 It appears clear to me that the express provisions of the antenuptial agreement foreclose any consideration of Nancye's benefiting beyond the terms of that agreement.
 
 
 66
 The antenuptial agreement signed by the parties contains 21 paragraphs. Most of these paragraphs describe the various promises made by the parties in contemplation of marriage. In paragraph 2 of the agreement, Nancye indicates she understands, acknowledges, and accepts that the property interests of Ed, including his pension plans, "are and always will remain the separate property of Ed." Paragraph 2 specifically states:
 
 
 67
 NANCYE understands, acknowledges and accepts that (a) the property and interests in property set forth on Exhibit B attached hereto and made a part hereof, are, and will always remain, the separate property of ED, whether determined under the laws of Kentucky or any other jurisdiction....
 
 
 68
 While it is true that paragraph 2 does not list the pension plans by name, they are incorporated by reference to an attachment identified as Exhibit B. Exhibit B contains an itemized list of Ed Callahan's separate property, including the pension plans.
 
 
 69
 In paragraph 3, Nancye waived, released and relinquished any and all claims and rights of every kind, nature or description that she had or thereafter acquired by reason of her marriage to Ed, in Ed's separate property. This paragraph specifically provides:
 
 
 70
 NANCYE hereby waives, releases and relinquishes any and all claims and rights of every kind, nature or description that she may now have or hereafter acquire by reason of her marriage to ED, or on account of any relationship, formal or informal, with ED prior to their marriage, as wife, surviving spouse, heir of ED or otherwise, in ED's Separate Property under the present or future laws of Kentucky or any other competent jurisdiction....
 
 
 71
 In argument and briefing, neither of the parties discussed the ramifications of promises contained in these two paragraphs. Instead, attention has focused throughout on the language of paragraph 15, which provides as follows:
 
 
 72
 (a) Effective when Ed and NANCYE are married, NANCYE consents to (i) ED'S election to waive, (II) ED's election, if any, to revoke such waiver, and (iii) any election by ED to subsequently waive, a qualified joint and survivor annuity form of benefit under any plan of deferred compensation to which section 401(a)(11) of the Internal Revenue Code of 1986 ("Code") or Section 205 of the Employee Retirement Income Security Act of 1974 ("ERISA") shall apply and to which ED shall currently or hereinafter be deemed a vested participant within the meaning of section 417(f)(1) of the Code and Section 205(h)(1) of ERISA. NANCYE further agrees that Ed may designate any beneficiary ED desires as to any qualified plan death benefit if ED dies. NANCYE hereby acknowledges that as a result of such consents and waivers she will not be entitled to a death benefit under such plans, even if NANCYE AND ed are married to each other at ED's death. NANCYE hereby agrees to execute all such further documents requested by ED to evidence the consents and waivers herein made, in the form and manner requested by ED. NANCYE specifically agrees to execute the attached forms as to ED'S interest in the Hutsell, Callahan & Buchino, P.S.C. plan and ED's Individual Retirement Account as soon as possible after marrying ED.
 
 
 73
 Based on the language of paragraph 15, the majority finds that Nancye will have breached the prenuptial agreement if and only if she was presented with the beneficiary designation forms and refused to sign them. I disagree. I think that, by virtue of the promises contained in paragraphs 2 and 3, she unequivocally waived her right to make any claim to Ed's pension benefits.
 
 
 74
 Nancye repudiated these promises and breached the agreement by demanding that the pension administrator make payment to her following Ed's death.
 
 
 75
 Although the majority contends that, if paragraphs 2 and 3 stood alone, they would be self-executing, it finds that the added presence of paragraph 15 requires Nancye to execute the waiver form before the promises contained in paragraphs 2 and 3 could be given effect. I totally disagree. Although paragraph 15 suggests that additional forms were contemplated, it seems obvious that these forms were intended to reiterate the promises already contained in the antenuptual agreement. Although these additional forms may have been necessary to satisy the legal requirements of ERISA, the absence of these forms should not prevent this Court from exercising its equitable powers in order to enforce Nancye's unequivical waiver of any interest in any of Callahan's pension plans. For these reasons, I would reverse the decision of the district court, and enter an order granting summary judgment for the Defendants.
 
 
 
 [1]
 The Honorable Horace W. Gilmore, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [2]
 Ed had two children, Courtney and Christopher, at the time of his death in 1991. The inter vivos trust was named as the residuary beneficiary under a will executed immediately after the trust agreement was amended in 1988
 
 
 [3]
 A 1990 summary plan description of the pension plans identifies the plan administrator as "Hutsell, Callahan & Buchino, P.S.C.," followed by an address, telephone number, and the words "Attention: Thomas S. Hutsell, M.D."
 
 
 [4]
 This was not in the affidavit, but a will codicil executed by Ed on March 6, 1991, provided that Ed's 1988 will would not be revoked by his subsequent marriage to Nancye. Ed amended his trust agreement on the same date (March 6, 1991) to provide that in the event of his death while married to Nancye the trustee was to pay her $100,000 and provide for the continuation of her health insurance coverage
 
 
 [5]
 The record also contains an individual retirement account beneficiary designation purportedly signed by Ed on March 6, 1991. This form made no provision for spousal consent. The disposition of the IRA is not at issue in this litigation
 
 
 [6]
 One of Ed's pension plans was covered by a subsection of ERISA authorizing a plan provision that would make benefits payable to the surviving spouse in full upon the death of the participant, absent an election by the participant to have the benefits paid in the form of a life annuity. See 29 U.S.C. Sec. 1055(b)(1)(C). Another subsection provides that a plan is not to be treated as failing to meet the requirements of Sec. 1055(b)(1)(C) "merely because the plan provides that benefits will not be payable to the surviving spouse of the participant unless the participant and such spouse had been married throughout the 1-year period ending on the earlier of the participant's annuity starting date or the date of the participant's death." 29 U.S.C. Sec. 1055(b)(4). Similar rules authorizing plan provisions that would deny benefits to a spouse married to the participant for less than one year are contained in statutory sections dealing with the qualification of benefit plans for tax purposes. See 26 U.S.C. Secs. 401(a)(11)(D) and 417(d). Neither of Ed's plans provided that benefits would not be payable to a surviving spouse who had been married to the participant for less than a year, and the cited statutory provisions do not appear to affect the outcome of this case
 
 
 [7]
 We would prefer to see a fuller record before we speak definitively to the questions of whether Nancye should get the money earmarked for her in the trust agreement and whether the district court abused its discretion in denying Nancye's request for attorney fees. The parties may find it helpful to know, however, that our current inclination would be to say "yes" to the first question and "no" to the second